UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TINA ROSA and ARTHUR PUGH                              :
                                                       :
                  Plaintiffs,                          :
                                                       :
            v.                                         :
                                                       :
CITY OF SYRACUSE; GREATER SYRACUSE                     :
PROPERTY DEVELOPMENT CORPORATION;                      :        Jury Trial Demanded
STEPHANIE MINER, in her official capacity as           :
Mayor of the City of Syracuse; DAVID                   :        Civil Case No.  5:16-cv-1123 (GTS/TWD)
DelVECCHIO, in his official capacity as                 :
Commissioner of Finance of the City of Syracuse;       :
KATELYN WRIGHT, in her official capacity as            :
Executive Director of the Greater Syracuse Property    :
Development Corporation; and VITO SCISCIOLI,           :
in his capacity as Chair of the Board of Directors of  :
the Greater Syracuse Property Development              :
Corporation                                            :
                                                       :
                  Defendants.                          :
-----------------------------------------------------------------X

## COMPLAINT

## I.    NATURE OF THE ACTION

1.      Syracuse, New York is among the poorest cities in the United States.  It is a city

desperate for economic development, an increased tax base, and the benefits that should

flow from those improvements to its residents.  Unfortunately, that desperation has led

the City of Syracuse to punish the very residents who need that help the most – low-

income homeowners.  Plaintiffs, Tina Rosa and Arthur Pugh, are two such residents.

2.      In 2012, the City of Syracuse and Onondaga County formed the Greater Syracuse

Property Development Corporation, known as the "Land Bank."  The Land Bank was

formed pursuant to a New York State law with the stated purpose of returning abandoned

and tax delinquent properties to productive use by seizing and then selling such

properties. While that goal may be laudable, the establishment of the Land Bank has led to the unconstitutional seizure of properties that were already in productive use. Ms. Rosa owned her property outright, maintained it, and rented it to supplement her income. The Land Bank now owns that home because of a tax debt of less than $900 that was incurred by a prior owner of the property. Mr. Pugh also owned his home without a mortgage. He spent years maintaining and improving that property. He lost his home to the Land Bank without the opportunity to contest the amount of taxes allegedly owed.

3.    The properties owned by Ms. Rosa and Mr. Pugh were not blights on the community. Their properties were benefits to their neighborhoods. Yet, both Ms. Rosa and Mr. Pugh find themselves in the situation of having lost their homes to the Land Bank in deprivation of their constitutional rights.

4.    Plaintiffs Arthur Pugh and Tina Rosa, through their attorneys, Legal Services of Central New York, Inc., Samuel C. Young, Esq. and Adam R. Crowley, Esq., of counsel, bring this action pursuant to 42 U.S.C. § 1983, the Takings Clause of the Fifth Amendment of the United States Constitution as incorporated through the Fourteenth Amendment of the United States Constitution, and the due process clauses of the Fourteenth Amendment of the United States Constitution and Article I of the New York State Constitution against defendants City of Syracuse, the Greater Syracuse Property Development Corporation ("Land Bank" or "GSPDC"), Stephanie Miner, Katelyn Wright, David DelVecchio, and Vito Sciscioli. Plaintiffs allege that Defendants have violated their rights under the United States and New York State constitutions by taking their real property without just compensation and due process. For this Complaint, Plaintiffs allege the following:

5.      When an owner of real property in the City of Syracuse, New York fails to pay taxes on that property, City law allows the city to foreclose on that property and either auction the property to a third-party or transfer the property to the Land Bank for a *de minimis* amount.

6.      Upon transferring the delinquent property to the Land Bank, the City of Syracuse also grants the Land Bank the deed and full title to the property.  The Land Bank then holds the property until it is sold to a third-party.

7.      There is no minimum amount of back taxes that triggers this transfer process. Further, this process does not include any formal safeguards allowing a homeowner to challenge the amount of taxes allegedly owed.

8.      Further, the process of transferring property from the City of Syracuse to the Land Bank not only transfers deed and title of that property, it essentially transfers all equity in the property away from the homeowner who accumulated it.  Neither the City of Syracuse nor the Land Bank are required to transfer to the original homeowner any proceeds from the ultimate sale of the home that exceed the delinquent taxes, interest, penalties, expenses and attorney's fees.  Rather, the ultimate purchaser of a property retains that excess, essentially denying the original homeowner any equity in the property that he or she had accumulated.

9.      For example, if the City of Syracuse determines that a homeowner owes $1,000 in delinquent taxes, the City may foreclose on that property and ultimately transfer it to the Land Bank.  This foreclosure and transfer may occur even if that $1,000 bears no

rational relationship to the value of the property – even if the home is worth many times that amount.

10.     This situation is even more unsettling where a homeowner disputes that he owes the amount alleged by the City of Syracuse.  There is no formal procedure to challenge the alleged amount of taxes owed.  The homeowner lacks the ability to request a formal hearing and present evidence that the amount allegedly owed is incorrect.

11.     Further, a homeowner who owes $1,000 in unpaid taxes will lose any equity that he may have accumulated in the property.  Because neither the City of Syracuse nor the Land Bank are required to return excess proceeds from the ultimate sale of the home, the original homeowner will lose all equity to the third-party who purchases the home from the Land Bank.  This is the case even where a homeowner owes $1,000 in unpaid taxes and has $50,000 in equity on a home.

12.     The Fourteenth Amendment of the United States Constitution guarantees that no individual will be deprived of property without due process of law.  Here, defendants violate the procedural due process rights of homeowners in Syracuse by foreclosing on their homes and transferring them to the Land Bank without the ability to formally contest the amount allegedly owed or the nature of the transfer itself.

13.     This process also violates homeowners' substantive due process rights as guaranteed by the Fourteenth Amendment.  Substantive due process, at a minimum, requires that governmental action bear some rational relationship to a legitimate government interest.  Here, plaintiffs do not dispute that a municipality has a legitimate interest in collecting property taxes and enforcing those taxes through a foreclosure process.  However, the process employed by the City of Syracuse bears no rational

relationship to that governmental goal. Seizing homes even where the amount allegedly owed bears no relationship to the value of the home – including situations where the amount of unpaid taxes can only be described as *de minimis* – is not a rational way to enforce local tax laws.

14.     The Fifth Amendment of the United States Constitution guarantees that no private property can be taken without just compensation. Additionally, that taking must be done for a "public purpose." Here, the City of Syracuse and Land Bank take the property of local homeowners without compensating them for any excess proceeds raised from the ultimate sale of the property. This procedure deprives homeowners of any equity accumulated in the home, an amount that the homeowner has worked for and has a property interest in, without any compensation.

15.     Through this process, the City of Syracuse grants a homeowner's property – the equity he has built in his home – to the Land Bank with no compensation to the homeowner. The Land Bank then retains that equity upon sale of the home, often to a private third-party purchaser. That third-party purchaser then acquires the original homeowner's equity if the property is sold for below its market value. At no point is the original homeowner compensated through excess proceeds from this sale.

16.     The victims of this unconstitutional abuse of government power are the most vulnerable members of our community. Plaintiffs, and many others like them, are low-income residents of the City of Syracuse who have been unable to pay property taxes on their homes. They are often unable to fully understand or exercise their constitutional rights. These residents face the risk of losing their homes for disputed amounts of unpaid taxes. They face the risk of losing their homes for relatively small amounts of

unpaid taxes.  They also face the risk of losing any equity they have spent years building in their homes.

17.     The plight of plaintiffs Pugh and Rosa demonstrates the dangers of this government abuse and overreach.  Ms. Rosa is a Syracuse resident who purchased the home at issue in this litigation for $20,000 intending to use it as a rental property to supplement her income as a school bus driver.  Ms. Rosa paid her taxes every year that she owned the house.  Despite owning her house in full and paying her taxes as required, defendants seized her home for a tax debt of less than $900 that had been accumulated by the previous owner.  Ms. Rosa attempted to pay that amount upon learning of the prior owner's delinquent taxes.  She was not allowed to do so.

18.     Mr. Pugh is a disabled Army veteran who raised his children in the home at issue in this litigation.  He purchased the home in 2003 for $8,500.   He paid off the home and it had no mortgage.  Mr. Pugh fell behind in his property taxes in approximately 2004.  Those unpaid taxes were eventually converted into liens and the City of Syracuse then sold those liens to a third-party entity known as Guardian Law.  Mr. Pugh then began paying Guardian Law for those back taxes and believes that he paid that entity tens of thousands of dollars.  In 2013, the City of Syracuse sent Mr. Pugh a letter stating that he owed over $25,000 back taxes for the years of 2007-2012 and was at risk of losing his home to foreclosure.  Mr. Pugh, believing that he did not owe that amount of taxes, contacted the City of Syracuse to dispute the amount owed.  He found that there was no formal process for disputing the amount of money owed.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

20.     Venue is properly in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391 as the properties at issue are located in the Northern District and a substantial part of the acts and omissions at issue in this matter took place in this District.

## III.   PARTIES

21.     Plaintiff Arthur Pugh is a citizen of the United States and a resident of Syracuse, New York.

22.     Plaintiff Tina Rosa is a citizen of the United States and a resident of Syracuse, New York.

23.     Defendant City of Syracuse is a municipality and political subdivision of the State of New York incorporated under the laws of the State of New York.

24.     Defendant Greater Syracuse Property Development Corporation is an entity authorized by the laws of the State of New York and was established on March 27, 2012 by intermunicipal agreement between the County of Onondaga, New York and City of Syracuse.

25.     Defendant Stephanie Miner is the elected Mayor of the City of Syracuse.  She has held that position since January 1, 2010 and at all times relevant to the issues in this litigation.

26.     Defendant David DelVecchio is the appointed Commissioner of Finance of the City of Syracuse.  Defendant Miner retained Defendant DelVecchio in that position upon taking office on January 1, 2010.

27.     Defendant Katelyn Wright is the appointed Executive Director of Defendant Greater Syracuse Property Development Corporation.  The Board of Directors of

Defendant Greater Syracuse Property Development Corporation is charged with appointing that entity's Executive Director.

28.     Defendant Vito Sciscioli is the Chair of the Board of Directors of the Defendant Greater Syracuse Property Development Corporation.  Defendant Miner appointed Defendant Sciscioli to that position upon the creation of Defendant Greater Syracuse Property Development Corporation.

29.     Defendants are state actors within the meaning of 42 U.S.C. § 1983.

## IV.     **LEGAL BACKGROUND**

30.     The Syracuse Tax and Assessment Act, Syr. Rev. Gen. Ord. § 19-26, *et seq.*, outlines the methods through which the City of Syracuse may seize a parcel of real property for alleged unpaid taxes.

31.     Any tax debt that is over six months old may trigger the tax seizure process. *Id.* at § 19-46.  After the expiration of six months, the commissioner of finance is required to publish notices in one newspaper once per week for two weeks stating the amount of unpaid taxes, fees, and penalties, that the subject property will be sold at public auction if that amount is unpaid, and stating the dates for a redemption period.

32.     After the expiration of those two weeks, the commissioner of finance may sell the property at public auction. *Id.*  The commissioner is required to "bid in" on the property on behalf of the city in an amount sufficient to satisfy the alleged back taxes, fees, and penalties on the subject property.

33.     The sale of the subject property triggers a one-year redemption period during which the delinquent homeowner may pay the amount of unpaid taxes, penalties, and fees to reacquire the home.  Within 60 and 30 days of the expiration of the redemption

period, the City of Syracuse is required to send the affected homeowner notices stating that the subject property will be transferred by tax deed to the City of Syracuse at the expiration of the redemption period.

34.     After the expiration of one year, the commissioner of finance may transfer a property acquired through the "bid in" process to the City of Syracuse through the issuance of a tax deed to the city.  *Id.* at § 19-46(8).

35.     The City of Syracuse may then dispose of the property to any public or private entity or individual through any means authorized by the city.  *Id.* at § 19-46(9).  As is an issue in this matter, the City of Syracuse may then transfer title to the property to the Land Bank through a vote of the Syracuse Common Council.  Local law states that the City of Syracuse may dispose of any property it acquires through tax deed in any manner approved by ordinance of the Common Council and the approval of the mayor. *Id.*

36.     Syracuse City law also allows for the sale of tax liens to private third-parties. Upon information and belief, the City of Syracuse regularly sold tax liens to for-profit corporations, including entities known as American Tax Finance ("ATF") and Guardian Law between approximately 2007 to 2012.

37.     New York State Not-for-Profit Corporation Law allows municipalities to establish land bank programs for the acquisition and sale of local property.  N.Y. CLS N-PCL § 1600, *et seq.* ("Land Bank Act").  The purpose of the Land Bank Act is to "facilitate the return of vacant, abandoned, and tax-delinquent properties to productive use." *Id.* at § 1601.  The Land Bank Act allows municipal entities to transfer real property to a land bank and allows for a land bank to then sell that property.

38.     The Greater Syracuse Property Development Corporation ("Land Bank") was established through an intermunicipal agreement between the City of Syracuse and Onondaga County on March 27, 2012.  A copy of this intermunicipal agreement is attached hereto as Exhibit "A" to this Complaint.  The agreement broadly states that the Land Bank has all "powers necessary to carry out and effectuate the purposes...of the Land Bank Act..."  Ex. A at § 5.01.

39.     This intermunicipal agreement governs the procedures of the Land Bank.  It does not provide for any procedures for contesting its acquisition or transfer of property.  The agreement also makes no mention of returning excess funds from the sale of property above the taxes, fees, and penalties to compensate the original owner for equity he or she accumulated in the home.

40.     The members Board of Directors of the Land Bank are appointed by the elected officials of the City of Syracuse and Onondaga County.

## V.     **FACTS SPECIFIC TO PLAINTIFF TINA ROSA**

41.     Plaintiff Tina Rosa is a resident of Syracuse and lives with her family at 207 Davis Street.  She is the former title holder of 204 Davis Street in Syracuse, the property at issue in this matter.

42.     Ms. Rosa purchased 204 Davis Street in September 2009 for approximately $20,000.  She purchased the home with the intention of using it as a rental property to supplement her income as a school bus driver.

43.     Ms. Rosa paid the full purchase price at the time she purchased the property.  She never had a mortgage on that property.  At the time of closing, Ms. Rosa received a warranty deed stating that there were no outstanding liens on the home.

44.     Ms. Rosa paid her local taxes on the property and was current on her taxes at the time the events at issue in this matter began.

45.     On December 8, 2015, the City of Syracuse Department of Finance sent Ms. Rosa a letter stating that her property had $889.92 in unpaid taxes, plus interest, fees and penalties. The letter further stated that Ms. Rosa had 30 days to pay the amount demanded or her home would be transferred to the City of Syracuse through the issuance and recording of a tax deed.

46.     Ms. Rosa was visiting family outside of New York at the time this letter was sent. She was unaware of the letter until she returned to the area after the redemption date stated in that letter.

47.     Ms. Rosa was confused as to why the City of Syracuse was seeking unpaid taxes on her home. She had paid her taxes on time and in person at the Syracuse City Hall. No city employee had ever informed her of unpaid taxes when she appeared to pay her current taxes.

48.     Upon information and belief, the taxes allegedly owed on this property were the responsibility of the previous owner of the property. Despite issuing a warranty deed stating that there were no outstanding taxes on the home, the prior owner did, in fact, owe a small amount of local taxes. Ms. Rosa was led to believe that no taxes were owed and that the property was clear of any such encumbrances.

49.     Faced with the prospect of losing her property and a primary source of income, Ms. Rosa again visited Syracuse City Hall with the intention of paying the amount demanded in the December 8 letter. She was told that the home had been transferred to the City of Syracuse and the Land Bank and there was nothing she could do.

50.     On March, 23, 2016, Ms. Rosa filed a notice of claim against the City of Syracuse alleging that the City of Syracuse's seizure of her home was an unconstitutional taking and that her due process rights were violated.  She was deposed in connection with that notice of claim on June 24, 2016.  The Syracuse City Attorney's office ultimately denied her claims.

51.     Ms. Rosa has suffered financial and emotional harm as a result of the defendants' actions.

52.     At the time her property was seized, Ms. Rosa rented that house to a tenant for $1,000 per month.  She has lost that source of income. Ms. Rosa has not been allowed to enter the house since it was seized.

## VI.     FACTS SPECIFIC TO PLAINTIFF ARTHUR PUGH

53.     Plaintiff Arthur Pugh is a resident of the City of Syracuse and lives at 106 Elmwood Avenue, the property at issue in this litigation. Mr. Pugh is a disabled veteran of the United States Army.

54.     Mr. Pugh purchased the subject property for $8,500 in 2003.   He later fell behind in his local taxes and then received a notice from an entity known as Guardian Law that it had acquired tax liens on his home.  Mr. Pugh contacted Guardian Law and began making monthly payments in the amount of $570 to satisfy his tax burden.  Mr. Pugh regularly made these payments, believing that he was working to eliminate his tax burden.

55.     Mr. Pugh believes he paid approximately $25,000 to Guardian Law.

56.     On October 28, 2014, Mr. Pugh received a notice from the City of Syracuse Department of Assessment stating that he owed $27,849.48 in delinquent taxes for the

years 2007-2012.  The letter further stated that Mr. Pugh had 60 days to redeem the property by paying the full amount allegedly owed.

57.     Mr. Pugh believed this amount was an error and visited the Department of Assessment to challenge that amount.  He was unable to receive a clear answer as to why he allegedly owed this amount despite his repeated payment on delinquent property taxes.

58.     On February 10, 2015, Mr. Pugh received a letter from the City of Syracuse Department of Neighborhood and Business Development informing him that his home was scheduled for tax foreclosure.  It stated that the Syracuse Common Council was scheduled to vote on transferring his property to the City of Syracuse in "May of 2015." No more specific date was given.

59.     Mr. Pugh later received another letter nearly identical in substance to the letter he received on February 10.  This second later was dated June 2, 2015 and stated that the Common Council would instead vote on the transfer of his home on July 13, 2015.

60.     Mr. Pugh continued to contest the amount of taxes that he allegedly owed.

61.     According to Onondaga County property records, Mr. Pugh's home was transferred to the City of Syracuse on November 6, 2015 and then to the Greater Syracuse Property Development Corporation that day.

62.     Mr. Pugh's home is now owned by the land bank.  Mr. Pugh was never given an opportunity to challenge the amount of taxes allegedly owed prior to the transfer of his home to the Land Bank.

63.     On December 16, 2015, Mr. Pugh filed a notice of claim against the City of Syracuse alleging that he had lost approximately $49,000 in equity in his home when it was transferred to the City of Syracuse and then the Land Bank.  He outlined numerous

attempts to resolve this matter with the City of Syracuse and his belief that the amount of taxes owed was much lower than what was alleged.

64.     Mr. Pugh underwent a deposition in connection with his notice of claim on March 2, 2016 at Syracuse City Hall.  As of the date of this action, Mr. Pugh has still not been given the opportunity to contest the amount of taxes owed.  Neither has the Defendant City of Syracuse offered any payment on or resolution of his claim.

65.     Mr. Pugh is now in danger of being removed from his home.  The Land Bank has initiated a summary squatter proceeding against him in Syracuse City Court.  The Land Bank may now acquire a warrant of eviction allowing the Syracuse City Marshal to physically remove Mr. Pugh and his possessions from the premises as early as September 8, 2016.

## VII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### CLAIM PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

66.     Plaintiffs repeat and incorporate the facts and allegations contained in paragraphs 1 through 65.

67.     Defendants are state actors within the meaning of 42 U.S.C. § 1983.

68.     By taking private property without compensating homeowners for any equity that has been accumulated in that property, Syracuse City Tax and Assessment Act violates the Fifth Amendment of the United States Constitution as incorporated to the States under the Fourteenth Amendment of the United States Constitution.

69.     Syracuse City law provides no mechanism for compensating private homeowners for the value of their property above the amount owed in unpaid taxes, penalties, and

fees.  Regardless of how much equity a property owner holds in his or her property or how minor a tax obligation may be, Syracuse City law provides that the City may take that property and transfer it to the Land Bank without compensating the homeowner for that equity which has been seized by the City of Syracuse.

70.    Further, the intermunicipal agreement governing the actions of the Land Bank provides that the Land Bank may ultimately transfer any such property to a private party. That private party then acquires the equity that the initial homeowner had accumulated in his or her property.

71.    Equity in a home is a property right that may not be taken without just compensation pursuant to the Fifth Amendment of the United States Constitution.  For instance, equity in private property is a partial interest in that property that is subject to distribution in family and probate proceedings.

72.    Further, the ultimate transfer of property to a private purchaser to the ultimate benefit of that private purchaser through the Land Bank process violates the requirement that a government entity may only take private property for public use.

73.    While enforcing local tax laws is a legitimate exercise of government power in the public interest, the taking and transfer of amounts of equity that are above and beyond the amount of public debt owed destroy any relationship between the seizure of private property and the public interest that seizure is intended to serve.

74.    For the reasons stated, the Syracuse Tax Assessment Act and the procedures governing the actions of the Land Bank violate the Fifth Amendment of the United States Constitution.

75.    The Syracuse Tax Assessment Act, the policies and procedures governing the

Land Bank, and defendants' actions pursuant to these local laws and policies have

deprived plaintiffs of their right to just compensation for the taking of their properties.

76.    Plaintiffs have been damaged by the loss of their homes and any equity in those

homes through this unconstitutional exercise of government power.

## SECOND CAUSE OF ACTION

## CLAIM PURSUANT TO PROCEDURAL DUE PROCESS RIGHTS AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

77.    Plaintiffs repeat and incorporate the facts and allegations contained in paragraphs

1-76.

78.    The Fourteenth Amendment of the United States Constitution prohibits any

government entity from depriving an individual of property without due process of law.

79.    Defendants are state actors within the meaning of 42 U.S.C. § 1983 and acted

under the color of state law.

80.    Individuals have a property interest in their homes and the equity that they have

built in those homes.

81.    Syracuse City law and the procedures governing the actions of the Land Bank

lack sufficient procedural safeguards to protect those property rights.

82.    For instance, there is no opportunity for a homeowner in the City of Syracuse to

challenge the amount of taxes allegedly owed once the tax foreclosure process has begun.

Rather, a homeowner's only option is to pay the amount of alleged unpaid taxes, fees,

and penalties or risk losing their home.  There is no formal procedure allowed for the

presentation of evidence and witnesses before an impartial party to determine whether the amount allegedly owed is correct.

83.     There is also no opportunity to challenge the propriety of the procedures followed in the tax foreclosure process, the tax seizure process, and the process of transferring the subject property to the Land Bank.  A homeowner who did not receive the notices required under Syracuse City law has no opportunity to make such an allegation in a formal process prior to the seizure of his or her home.

84.     As such, Syracuse City Law and the procedures governing the Land Bank deprive city residents of property without procedural due process.  These local laws and procedures, therefore violate plaintiffs' procedural due process rights pursuant to the Fourteenth Amendment of the United States Constitution.

85.     The Syracuse Tax Assessment Act, the policies and procedures governing the Land Bank, and defendants' actions pursuant to these local laws and policies have deprived plaintiffs of their right to procedural due process.

86.     Plaintiffs have been harmed as a result of this unconstitutional deprivation of due process.

### THIRD CAUSE OF ACTION

### CLAIM PURSUANT TO SUBSTANTIVE DUE PROCESS RIGHTS AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

87.     Plaintiffs repeat and incorporate the allegations and facts contained in paragraphs 1 through 86 above.

88.     Defendants are state actors within the meaning of 42 U.S.C. § 1983 and acted under color of state law.

89.     Plaintiffs have a property interest in their homes and the equity they have built in those homes.

90.     The Fourteenth Amendment requires that government action depriving an individual of a protected right must, at a minimum, be rationally related to a legitimate government purpose.

91.     There is no question that the collection of local taxes and the enforcement of local tax laws is a legitimate government interest.  However, the methods through which defendants attempt to protect those interests are not rational.

92.     Syracuse City law, as discussed above, sets no minimum amount of unpaid taxes that may trigger the seizure process.  There is no requirement that the alleged tax debt bear any relationship to the value of the property that the City of Syracuse will acquire through the tax seizure process.  The City of Syracuse may seize property and transfer it to the Land Bank for any amount in unpaid taxes.

93.     For instance, Plaintiff Tina Rosa lost her home for a debt of less than $1,000.  The City of Syracuse then acquired her property, which is worth many times that amount, and transferred it to the Land Bank.

94.     The seizing and transferring property for debts that can only be described as *de minimis* bears no rational relationship to the interest of collecting taxes and enforcing local tax law.  Defendants may serve those interests through any number of other means, including private civil actions to seek monetary judgments for alleged unpaid taxes.

95.     Further, there is no requirement that the affected homeowner have been the individual who actually accumulated the alleged tax debt.  Syracuse City law allows for the seizure and transfer of homes for unpaid taxes that were accumulated by a previous

owner, even where the affected homeowner has paid all taxes since acquiring the property.  Taking of property from an individual who is in compliance with local tax laws for another individual's violations of those same laws is not a rational method through which to enforce them.

96.     As such, Syracuse City law violates Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution.

97.     The Syracuse Tax Assessment Act, the policies and procedures governing the Land Bank, and defendants' actions pursuant to these local laws and policies have violated plaintiffs' substantive due process rights.

98.     Plaintiffs have been harmed by this unconstitutional exercise of government power.

## FOURTH CAUSE OF ACTION

## CLAIM PURSUANT TO ARTICLE I, § 7 OF THE CONSTITUTION OF THE STATE OF NEW YORK FOR THE TAKING OF PRIVATE PROPERTY WITHOUT JUST COMPENSATION

99.     Plaintiffs repeat and incorporate the facts and allegations contained in paragraphs 1 through 98.

100.    Article I, § 7 of the Constitution of the State of New York states that "[p]rivate property shall not be taken for public use without just compensation."

101.    Plaintiffs have a property interest in their homes and their equity in those homes.

102.    As discussed in plaintiffs' First Cause of Action, *supra*, Syracuse City Law and the procedures governing the actions of the Land Bank provide no protection of a homeowner's equity in his or her home.

103.    The City of Syracuse and Land Bank acquire any equity in the home above the amount of unpaid taxes, fees, penalties, and interest required to redeem the property.  The homeowner received no compensation for that lost property.

104.    As such, Syracuse law and the procedures governing the Land Bank and defendants' actions pursuant to those local laws and procedures violate Article I, § 7 of the Constitution of the State of New York.

105.    Plaintiffs have been harmed by this unconstitutional exercise of governmental power.

## FIFTH CAUSE OF ACTION

### CLAIM PURSUANT TO ARTICLE I, § 6 OF THE CONSTITUTION OF THE STATE OF NEW YORK FOR VIOLATION OF PLAINTIFFS' DUE PROCESS RIGHTS

106.    Plaintiffs repeat and incorporate the facts and allegations contained in paragraphs 1 through 105.

107.    The New York State Constitution guarantees that the government may not deprive an individual of property without due process of law.

108.    The laws of the City of Syracuse and procedures governing the actions of the Land Bank deprive homeowners of their property interests in their homes without the opportunity to be heard regarding any disputes regarding the transfer of that property.

109.    The Syracuse Tax Assessment Act, the policies and procedures governing the Land Bank, and defendants' actions pursuant to these local laws and policies have deprived plaintiffs of their due process rights under the New York State Constitution.

110.    As such, defendants have deprived plaintiffs of property without basic due process safeguards in violation of the New York State Constitution.

111.   Plaintiffs have been harmed by this unconstitutional deprivation of their due

process rights.


## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that the Court:

a.   Assume jurisdiction over this matter;

b.   Declare pursuant to 22 U.S.C. § 2201 that defendants' acts and omissions violated
     Plaintiffs' rights under the Fifth and Fourteenth Amendments of the United States
     Constitution;

c.   Declare pursuant to 22 U.S.C. § 2201 that defendants' acts and omissions violated
     Plaintiffs' procedural due process rights as guaranteed by the Fourteenth
     Amendment of the United States Constitution;

d.   Declare pursuant to 22 U.S.C. § 2201 that defendants' acts and omissions violated
     Plaintiffs' substantive due process rights as guaranteed by the Fourteenth
     Amendment of the United States Constitution;

e.   Declare pursuant to 22 U.S.C. § 2201 that defendants' acts and omissions violated
     Plaintiffs' rights to compensation for government takings as guaranteed by the
     New York State Constitution;

f.   Declare pursuant to 22 U.S.C. § 2201 that defendants' acts and omissions violated
     Plaintiffs' due process rights as guaranteed by the New York State Constitution;

g.   Enter preliminary and permanent injunctive relief in the form of an order
     prohibiting Defendant Greater Syracuse Property Development Corporation from

selling, granting, or otherwise transferring 106 Elmwood Avenue and 204 Davis Street, both located in the City of Syracuse;

h.  An order requiring that Defendant Greater Syracuse Property Development Corporation convey 106 Elmwood Avenue to Arthur Pugh and 204 Davis Street to Tina Rosa;

i.  An order preventing Defendant Greater Syracuse Property Development Corporation from evicting Plaintiff Arthur Pugh from 106 Elmwood Avenue;

j.  Award Plaintiffs damages in compensation for the injuries alleged herein;

k.  Award Plaintiffs reasonable attorneys fees and costs pursuant to 42 U.S.C. 1988; and

l.  Grant any other relief that the Court deems necessary and proper.


Dated September 13, 2016
        Syracuse, New York


                Respectfully submitted,



                _____
                Samuel C. Young (Bar No. 508916)
                Adam R. Crowley (admission pending)
                Legal Services of Central New York, Inc.
                221 South Warren Street, Suite 300
                Syracuse, New York 13202
                (315)703-6500 (t)
                (315)703-6520 (f)
                samyoung@lscny.org
                acrowley@lscny.org
                *Attorneys for Plaintiffs*

# Exhibit

# "A"

# INTERMUNICIPAL AGREEMENT

BETWEEN

## ONONDAGA COUNTY

### AND

## THE CITYOF SYRACUSE

## FOR THE CREATION OF THE

## GREATER SYRACUSE PROPERTY DEVELOPMENT CORPORATION

(a New York Land Bank)

## PREAMBLE

This intermunicipal agreement made and entered into this 27ᵗʰ day of March, 2012("Agreement") under the New York Land Bank Act, Article 16 of the New York Not-for-Profit Corporation Law, between **ONONDAGA COUNTY** (hereinafter the "County") and the **CITY OF SYRACUSE** (hereinafter the "City") (hereinafter collectively referred to as the "Parties") for the purpose of establishing and creating the **GREATER SYRACUSE PROPERTY DEVELOPMENT CORPORATION**, a type C not-for-profit corporation to administer and implement the purposes and objectives of this Agreement.

## RECITALS

WHEREAS, in enacting the New York Land Bank Act as Article 16 of the New York Not-for-Profit Corporation Law (hereinafter the "Land Bank Act"), the Legislature found that there exists in the state of New York a continuing need to strengthen and revitalize the economy of the state of New York and communities in this state and that it is in the best interests of the state of New York and communities in this state to confront the problems caused by vacant, abandoned and tax delinquent properties through the creation of land banks in a coordinated manner to foster the development of that property and to promote economic growth;

WHEREAS, § 1603 of the Land Bank Act permits any or any two or more foreclosing governmental units to enter into an intergovernmental cooperation agreement to establish a land bank.;

WHEREAS, the Parties herein agree that the establishment of a land bank would be beneficial to the Parties and to the citizens of both the City of Syracuse and the County of Onondaga; and

WHEREAS, the Parties desire to create the Greater Syracuse Property Development Corporation as a type c not-for-profit corporation to operate as a land bank in accordance with the Land Bank Act and to exercise the powers, duties, functions, and responsibilities of a land bank under the Land Bank Act.

Accordingly, the Parties agree to the following:

## ARTICLE I
## DEFINITIONS

As used in this Agreement the following terms shall have the meanings provided in this Article.

**Section 1.01. "Board of Directors"** or **"Board"** means the Board of Directors of the Land Bank.

**Section 1.02. "Agreement"** means this intermunicipal agreement between the Parties.

**Section 1.03.** "**Effective Date**" means the date upon which all of the following are satisfied:

    (a)    the Agreement is approved by resolution of the Onondaga County Legislature;

    (b)    the Agreement is approved by Ordinance of the Common Council of the City of Syracuse; and

    (c)    the creation of the Greater Syracuse Property Development Corporation is approved by the Empire State Development Corporation in accordance with Section 1603(g) of the Land Bank Act.

**Section 1.04.** "**Fiscal Year**" means the fiscal year of the Land Bank, which shall begin on January 1st of each year and end on the following December 31st.

**Section 1.05.** "**Land Bank Act**" means Article 16 of the New York Not-for-Profit Corporation Law and as it may be hereafter amended or replaced, subject to the provisions of Section 10.11 of this Agreement.

**Section 1.06.** "**Land Bank**" means the type c not-for-profit corporation established pursuant to and in accordance with the provisions of this Agreement and known as the Greater Syracuse Property Development Corporation.

**Section 1.07.** "**Party**" or "**Parties**" means either individually or collectively, as applicable, the County of Onondaga and/or the City of Syracuse.

**Section 1.08.** "**Person**" means an individual, authority, limited liability company, partnership, firm, corporation, organization, association, joint venture, trust, governmental entity, or other legal entity.

**Section 1.09.** "**Quorum**" means a majority of the members of the Board, not including vacancies.

**Section 1.10.** "**Real Property**" means all lands and the buildings thereon, all things permanently attached to land or to the buildings thereon, and any interest existing in, issuing out of, or dependent upon land or the buildings thereon.

**Section 1.11.** "**Tax Delinquent Property**" means real property encumbered by an outstanding tax lien for a delinquent tax as defined in Section 1102 of the New York Real Property Tax Law, or such other general, special or local laws as may be applicable to the property tax enforcement procedures of the Parties.

**Section 1.12.** "**State**" means the state of New York.

## ARTICLE II
## PURPOSE

**Section 2.01. Purpose.** The purpose of this Agreement is to create the Greater Syracuse Property Development Corporation to help address the Parties' problems regarding vacant and abandoned property in a coordinated manner and to further foster the development of such property and promote economic growth through the return of vacant, abandoned, and tax-delinquent properties to productive use.

**Section 2.02. Powers and Functions.** The Greater Syracuse Property Development Corporation shall have all of those powers, duties, functions, and responsibilities authorized pursuant to the Land Bank Act.

## ARTICLE III
## CREATION OF LAND BANK

**Section 3.01. Creation and Legal Status of Land Bank.** The Land Bank is established pursuant to the Land Bank Act as a type c not-for-profit corporation to be known as the "Greater Syracuse Property Development Corporation".

**Section 3.02. By-Laws, and Policies and Procedures.** The Board shall adopt by-laws consistent with the provisions of this Agreement and the Land Bank Act within forty-five (45) days of the Effective Date. The Board shall adopt policies and procedures consistent with the provisions of this Agreement and the Land Bank Act within ninety (90) days of the Effective Date.

**Section 3.03. Principal Office.** The principal office of the Land Bank shall be determined by the Board but shall always be in a location within the geographical boundaries of the City of Syracuse..

**Section 3.04. Title to Land Bank Assets.** All Real Property held in fee by the Land Bank shall be held in its own name.

**Section 3.05. Tax-Exempt Status.** The Parties intend the activities of the Land Bank to be governmental functions carried out by an instrumentality or political subdivision of the State as described in section 115 of Title 26 of the United States Internal Revenue Code, or any corresponding provisions of any future tax code. The Real Property of the Land Bank and all of the Land Bank's income and operations shall be exempt from all taxation by the State of New York or any of its political subdivisions.

**Section 3.06. Extinguishment of Taxes and Assessments.** Upon the request of the Land Bank and for the purposes of fostering the goals and objectives of the Land Bank, any Party, at its option and in its discretion, may extinguish any Real Property Taxes or special assessments levied by that Party against Real Property owned by the Land Bank.

**Section 3.07. Compliance with Law.** The Land Bank shall comply with all federal, State, and local laws, ordinances, rules, regulations, and orders applicable to this Agreement.

4

**Section 3.08. Relationship of Parties.** The Parties agree that the County shall not be responsible, in whole or in part, for the acts of the employees, agents, and servants of the City, whether acting separately or in conjunction with the implementation of this Agreement, and that the City shall not be responsible, in whole or in part, for the acts of the employees, agents, and servants of the County, whether acting separately or in conjunction with the implementation of this Agreement. The Parties shall only be bound and obligated under this Agreement as expressly agreed to by each Party. The Land Bank shall not obligate the City or the County nor shall any obligation of the Land Bank constitute an obligation of the City or the County.

**Section 3.09. No Third-Party Beneficiaries.** Except as otherwise specifically provided, this Agreement does not create, is not intended to create in any non-Party, by implication or otherwise, any direct or indirect benefit, obligation, duty, promise, right to be indemnified (such as contractually, legally, equitably, or by implication), right to be subrogated to any Party's rights under this Agreement, and/or any other right or benefit.

## ARTICLE IV
## BOARD, EXECUTIVE DIRECTOR AND STAFF

**Section 4.01. Board Composition.** The Land Bank shall be governed by a Board of Directors consisting of five members. Each member shall serve without compensation. Each member shall continue to serve until the appointment and qualification of his or her successor. Vacancies in the Board occurring otherwise than by expiration of term shall be filled for the unexpired term.

The members of the Board shall be appointed as follows:

(a)     One (1) member shall be appointed by the County Executive of Onondaga County;

(b)     One (1) member shall be appointed by the Chairman of the Onondaga County Legislature, and confirmed by the Onondaga County Legislature;

(c)     One (1) member shall be appointed by Mayor of the City of Syracuse;

(d)     One member shall be appointed by the Majority Leader of the Common Council of the City of Syracuse and shall be confirmed by the Common Council of the City of Syracuse

(e)     One (1) member shall be jointly nominated by the Mayor of the City of Syracuse and the County Executive of Onondaga County and shall be confirmed by both the Common Council of the City of Syracuse and the Onondaga County Legislature.

5

**Section 4.02.   Initial Members.**   The first term of the first Board members shall commence on the date of the first Board meeting. The initial Members of the Board of the Land Bank shall be:

(a)   Appointed by the County Executive of Onondaga County:
1)   Mary Beth Primo, for a term of two (2) years; and

(b)   Appointed by the Chairman of the Onondaga County Legislature, and confirmed by the Onondaga County Legislature:
1)   Daniel Barnaba, for a term of three (3) years.

(c)   Appointed by the Mayor of the City of Syracuse:
1)   Vito Sciscioli, for a term of two (2) years.

(d)   Appointed by the Majority Leader of the Common Council of the City of Syracuse and confirmed by the Common Council of the City of Syracuse:
1)   Dwight Hicks, for a term of three (3) years.

(e)   Jointly Nominated  by County Executive of Onondaga County, and the Mayor of the City of Syracuse and confirmed by both the Common Council of the City of Syracuse and the Onondaga County Legislature:
1)   James Corbett, for a term of three (3) years.

**Section 4.03   Term of Office.**   Except for the terms of the initial members as outlined in Section 4.02, the members of the Board appointed to succeed the initial members shall be appointed for a term of three (3) years.  Each Board member at the election of his or her appointing Party may serve a maximum of two full terms in addition to any partial term for which such member was appointed to fill a vacancy or any initial term that is less than a full three year term.  In the event State law is amended to provide for different terms and/or composition of the Board, then the Board as it exists at the time of such amendment shall be authorized to take any action required such that the Board complies with any requirements of State law.

**Section 4.04.  Qualifications.**   All members of the Board of the Land Bank shall all be residents of the County of Onondaga.  Members appointed in whole by the Mayor of the City of Syracuse, or the Majority leader of the Common Council of the City of Syracuse shall be residents of the City of Syracuse.  The jointly appointed member may be, but need not be, a resident of the City of Syracuse.

**Section 4.05  Removal.**  Board members may be removed by their appointing Party  for neglect of duty or misconduct in office   or may be removed pursuant to any other provision of New York law.

**Section 4.06.  Vacancies.**  A vacancy among the members of the Board appointed under section 4.01, whether caused by the death, resignation, or removal of a Board member, shall be filled in the same manner as the original appointment for the balance of the unexpired term. Such vacancy shall be filled as soon as practicable.

6

**Section 4.07. Meetings.** The Board shall conduct its first meeting no later than thirty (30) calendar days after the Effective Date. The Board shall meet at least annually and hold such other meetings at the place, date, and time as the Board shall determine.

**Section 4.08. Records of Meetings.** The Board shall maintain a written record of each meeting. All meetings of the Board shall comply with the provisions of Section 1612(a) of the Land Bank Act and be subject to the New York Open Meetings Law and the New York Freedom of Information Law.

**Section 4.09. Quorum and Voting.** Presence for both quorum and voting at a Board meeting may include electronic communication by which such member of the Board is both seen and heard by the members of the Board and any members of the public at the meeting. All actions of the Board shall be approved by the affirmative vote of a majority of the members of the Board present and voting; provided, however, no action of the Board shall be authorized on the following matters unless approved by a majority of the total Board membership:

(a) Adoption of by-laws and other rules and regulations for conduct of the Land Bank's business;

(b) Hiring or firing of any employee or contractor of the Land Bank. This function may, by a majority vote of the total Board membership, be delegated to a specific officer or committee of the Land Bank, under such terms and condition, and to the extent, that the Board may specify;

(c) The incurring of debt;

(d) Adoption or amendment of the annual budget; and

(e) Sale, lease, encumbrance, or alienation of real property, improvements, or personal property.

**Section 4.10. Board Responsibilities.** The Board shall have all powers necessary to carry out and effectuate the purposes and provisions of this Agreement and the Land Bank Act, including all of those powers set forth in Section 1607 of the Land Bank Act.

**Section 4.11. Fiduciary Duty.** The members of the Board are under a fiduciary duty to conduct the activities and affairs of the Land Bank in the best interests of the Land Bank, including the safekeeping and use of all Land Bank monies and assets. The members of the Board shall discharge their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

**Section 4.12. Compensation.** The members of the Board shall serve without compensation . The Board may reimburse any member for expenses actually incurred in the performance of duties on behalf of the Land Bank.

**Section 4.13. Executive Director.** The Board may select and retain an executive director. An executive director selected and retained by the Board shall administer the Land Bank in accordance with the operating budget adopted by the Board, general policy guidelines

7

established by the Board, other applicable governmental procedures and policies, and this Agreement. The executive director shall be responsible for the day-to-day operations of the Land Bank, the control, management, and oversight of the Land Bank's functions, and supervision of all Land Bank employees. All terms and conditions of the executive director's length of service shall be specified in a written contract between the executive director and the Land Bank. The executive director shall serve at the pleasure of the Board. The Board may delegate to the executive director any powers or duties it considers proper, subject to the constraints of Land Bank Act, and under such terms, conditions and extent that the Board may specify.

**Section 4.14. Employees.** The Land Bank may employ or otherwise contract for the services of any staff deemed necessary to carry out the duties and responsibilities of the Land Bank. Such staff may be employed as employees of the Land Bank, or the services of such staff may be retained pursuant to contracts with any Party or other public or private entities.

**Section 4.15. Conflicts of Interest.** No Member of the Board, or employee of the Land Bank shall acquire any interest, direct or indirect, in Real Property of the Land Bank, or in any Real Property to be acquired by the Land Bank. No Member of the Board, or employee of the Land Bank shall have any interest, direct or indirect, in any contract or proposed contract for materials or services to be furnished or used by the Land Bank. The Board shall establish policies and procedures requiring the disclosure of relationships that may give rise to a conflict of interest and may adopt ethical guidelines for Members of the Board and employees of the Land Bank. The Board shall require that any member of the Board with a direct or indirect interest in any matter before the Board disclose the member's interest to the Board before the Board takes any action on the matter.

## ARTICLE V
## POWERS OF LAND BANK

**Section 5.01. General Powers Under Land Bank Act.** The Land Bank shall have all those powers necessary to carry out and effectuate the purposes and provisions of the Land Bank Act including, but not limited to, all those powers specified under Section 1607 of the Land Bank Act, and all those other powers granted to Land Banks pursuant to the Land Bank Act or other statutory authority.

**Section 5.02 Purchase of Tax Liens.** The Land Bank may acquire liens relative to Tax Delinquent Property in accordance with Section 1616 of the Land Bank Act.

**Section 5.03. Execution of Legal Documents Relating to Real Property.** The terms of any contract or agreement concerning the sale, lease license, easement, encumbrance, or other alienation of any interest in Real Property, or improvements thereto, or personal property of the Land Bank, shall be approved by the Board. All contracts of the Land Bank shall be executed in the name of the Land Bank.

**Section 5.04. Civil Action to Protect Land Bank Real Property.** The Land Bank may institute a civil action to prevent, restrain, or enjoin the waste of or unlawful removal of any Real Property held by the Land Bank. The Land Bank may also institute any civil action to protect,

clear title to, determine the rights of parties to, remove liens from, or that are otherwise related to the Real Property of the Land Bank.

**Section 5.05. Transfer of Interests in Real Property by Land Bank.** On terms and conditions, in a manner, and for an amount of consideration the Land Bank considers proper, fair, and reasonable, including for no monetary consideration, the Land Bank may convey, sell, transfer, exchange, lease as lessor, or otherwise dispose of Real Property or rights or interests in Real Property in which the Land Bank holds a legal interest to any public or private Person subject to the Public Authorities Law, and any other statutory requirements.

**Section 5.06. Structure of Conveyances.** Transactions shall be structured in a manner that permits the Land Bank to enforce contractual agreements, real covenants, and the provisions of any subordinate financing held by the Land Bank pertaining to development and use of the Real Property.

**Section 5.07. Disposition of Proceeds.** Any proceeds from the sale or transfer of Real Property by the Land Bank shall be retained, expended, or transferred by the Land Bank as determined by the Board in the best interests of the Land Bank and in accordance with the Land Bank Act.

## ARTICLE VI
## RESTRICTIONS ON POWERS

**Section 6.01. Eminent Domain Prohibited.** The Land Bank shall neither possess nor exercise the power of eminent domain.

**Section 6.02. Limitation on Political Activities.** The Land Bank shall not spend any public funds on political activities. Subject to the foregoing, this section is not intended to prohibit the Land Bank from engaging in activities authorized by applicable law.

**Section 6.03. No Waiver of Governmental Immunity.** The Parties agree that no provision of the Agreement is intended, nor shall it be construed, as a waiver by any Party of any governmental immunity provided under any applicable law.

**Section 6.04. Non-Discrimination.** The Land Bank shall comply with all applicable laws prohibiting discrimination.

Section **6.05. Building and Housing Codes.** The Land Bank shall maintain all Real Property held by the Land Bank in accordance with applicable State laws and local codes.

## ARTICLE VII
## BOOKS, RECORDS, AND FINANCES

**Section 7.01. Land Bank Records.** The Land Bank shall keep and maintain at the principal office of the Land Bank all documents and records of the Land Bank. All records of the Land Bank subject to any claimed privilege, shall be made available to either Party, including the Onondaga County Comptroller, and the City Auditor of the City of Syracuse. The records

and documents shall be maintained until the termination of this Agreement and shall be delivered to any successor entity.

**Section 7.02. Financial Statements and Reports.** The Land Bank shall cause to be prepared, at the Land Bank's expense, audited financial statements (balance sheet, statement of revenue and expense, statement of cash flows, and changes in fund balance) on an annual basis. Such financial statements shall be prepared in accordance with generally accepted accounting principles and accompanied by a written opinion of an independent certified public accounting firm. The Land Bank shall be subject to audit by the office of the state comptroller in accordance with Section 1603(h) of the Land Bank Act.

**Section 7.03. Annual Budget.** The executive director, or other individual designated by the Board, shall prepare annually a budget for the Land Bank. The Board shall review and approve a budget for the Land Bank immediately preceding each Fiscal Year.

**Section 7.04. Deposits and Investments.** The Land Bank shall deposit and invest funds of the Land Bank, not otherwise employed in carrying out the purposes of the Land Bank, in accordance with an investment policy established by the Board consistent with laws and regulations regarding investment of Land Bank funds.

**Section 7.05. Disbursements.** Disbursements of funds shall be in accordance with guidelines established by the Board.

**Section 7.06. Performance Objectives.** Each Fiscal Year, the executive director, or other individual designated by the Board, shall prepare, for review and approval by the Board, objectives for the Land Bank's performance.

**Section 7.07. Real Property Inventory Records.** The Land Bank shall inventory all Real property owned, held, or disposed of by the Land Bank. The inventory shall be maintained as a public record and shall be available in accordance with Sections 1608(h) and (i), and Sections 1609(b) of the Land Bank Act.

## ARTICLE VIII
## FUNDING AND EXPENDITURES

**Section 8.01. Budget Contributions.** While under no obligation, the Parties may contribute to the annual Land Bank budget in such manner as approved by the Party or Parties

**Section 8.02. Issuance of Bonds.** The Land bank may issue, sell, and deliver bonds in accordance with the provisions of Section 1611 of the Land Bank Act.

**Section 8.03. Tax Allocation.** Upon the adoption of a resolution by the County Legislature and / or the adoption of a ordinance by the Common Council of the City of Syracuse, either party, or both parties collectively may provide for Fifty (50) percent of that Party's real property taxes collected on any specific parcel of real property identified in such resolution or ordinance (or both) to be remitted to the Land Bank for a period of five years in accordance with the provisions of section 1610(c) of the land Bank Act.

10

**Section 8.04. Management of Funds.** The Land Bank, shall designate a fiscal agent of the Land Bank to manage sales proceeds, monetary contributions made by the Parties', and other Land Bank funds. Standard accounting procedures shall be used in the management of Land Bank accounts.

**Section 8.05. Authorized Expenditures.** The Land Bank shall in its sole discretion and within its budget expend such funds as necessary to carry out the powers, duties, functions, and responsibilities of a land bank under the Land Bank Act consistent with this Agreement, and State law.

**ARTICLE IX**
**DURATION OF AGREEMENT**

**Section 9.01. Duration.** This Agreement shall commence on the Effective date and shall remain in full force and effect for a period of five years. This Agreement shall thereafter be automatically renewed for successive five year periods until withdrawal of one of the parties in accordance with section 9.02 or dissolution of the Land Bank in accordance with the provisions of Section 9.03.

**Section 9.02. Withdrawal by Party.** Either Party may withdraw from this Agreement upon six (6) months notice to the other Party, and to the Land Bank. The withdrawing Party shall have no rights to funds or other assets of the Land Bank. If at the time of withdrawal the requirements of the Land Bank Act provide that some Real Property of the Land Bank be liquidated, any sums received from the sale of such properties shall remain the funds of the Land Bank. Upon the withdrawal of any Party to this Agreement, the provisions of this Agreement shall remain in force for any remaining Parties to the Agreement.

**Section. 9.03. Dissolution.** The Land Bank may only be dissolved pursuant to the requirements of Section 1613 of the Land Bank Act.

**ARTICLE X**
**MISCELLANEOUS**

**Section 10.01. Notices.** Any and all correspondence or notices required, permitted, or provided for under this Agreement to be delivered to any Party shall be sent to that Party via certified mail, return receipt requested, and by regular US mail. All correspondence shall be considered delivered to a Party as of the date that such notice is deposited with sufficient postage with the United States Postal Service. All such written notices, including any notice of withdrawal under Article IX, shall be sent to the Parties the addresses below, or any subsequent address provided by either Party:

11

To: Onondaga County

Onondaga County
Office of the County Executive
Att: County Executive
John H. Mulroy Civic Center, 14th Floor
421 Montgomery Street
Syracuse, New York 13202

With carbon copy to:

Onondaga County
Department of Law
Att: County Attorney
John H. Mulroy Civic Center 10th Fl.
421 Montgomery Street
Syracuse, New York 13202

TO: The City of Syracuse

City of Syracuse
Office of the Mayor
Att: Mayor
233 East Washington Street
Syracuse, NY 13202
With Carbon Copy to:

City of Syracuse
Department of Law
Att: Corporation Counsel
233 East Washington Street
Syracuse, NY 13202

And to:

City of Syracuse
City Clerk
233 E. Washington Street, Rm. 231
Syracuse, NY 13202

**Section 10.02.  Entire Agreement.**  This Agreement sets forth the entire Agreement between the Parties and supersedes any and all prior agreements or understandings between them in any way related to the subject matter of this Agreement.  It is further understood and agreed that the terms and conditions of this Agreement are contractual and are not a mere recital and that there are no other contracts, understandings, or representations between the Parties in any way related to the subject matter of this Agreement, except as expressly stated in this Agreement.

12

**Section 10.03.  Interpretation of Agreement.** The Parties intend that this Agreement shall be construed liberally to effectuate the intent and purposes of this Agreement and the legislative intent and purposes of the Land Bank Act as complete and independent authorization for the performance of each and every act and thing authorized by this Agreement and the Land Bank Act. All powers granted to the Land Bank under this Agreement and the Land Bank Act shall be broadly interpreted to effectuate the intent and purposes and not as a limitation of powers.

**Section 10.04.  Severability of Provisions.** If any provision of this Agreement, or its application to any Person, Party, or circumstance, is invalid or unenforceable, the remainder of this Agreement and the application of that provision to other Persons, Parties, or circumstances is not affected but will be enforced to the extent permitted by law.

**Section 10.05.  Governing Law.** This Agreement is made and entered into in the State of New York and shall in all respects be interpreted, enforced, and governed under the laws of the State of New York without regard to the doctrines of conflict of laws. The language of all parts of this Agreement shall in all cases be construed as a whole according to its plain and fair meaning, and not construed strictly for or against any Party.

**Section 10.06.  Captions and Headings.** The captions, headings, and titles in this Agreement are intended for the convenience of the reader and are not intended to have any substantive meaning or to be interpreted as part of this Agreement.

**Section 10.07.  Terminology.** All terms and words used in this Agreement, regardless of the number or gender in which they are used, are deemed to include any other number and any other gender as the context may require.

**Section 10.08.  Cross-References.** References in this Agreement to any article include all sections, subsections, and paragraphs in the article, unless specifically noted otherwise. References in this Agreement to any section include all subsections and paragraphs in the section.

**Section 10.09.  Jurisdiction and Venue.** In the event of any disputes between the Parties over the meaning, interpretation, or implementation of the terms, covenants, or conditions of this Agreement, the matter under dispute, unless resolved between the Parties, shall be submitted to the courts of Onondaga County.

**Section 10.10.  Amendments to Agreement.** This Agreement may be amended or an alternative form of this Agreement adopted only upon written amendment approved by all Parties.

**Section 10.11.  Amendments to Land Bank Act.** The Land Bank shall have any powers authorized pursuant to any amendments, replacements, or substitutions to the Land Bank Act, unless the Agreement is amended by the Parties to provide otherwise.

Section **10.12  Cerificate of Incorporation.** The Certificate of Incorporation of the GREATER SYRACUSE PROPERTY DEVELOPMENT CORPORATION are attached to this Agreement as Exhibit "A" and incorporated herein by reference.

13

**Section 10.13.   Effective Date.**   This Agreement shall become effective as of the Effective Date as that term is defined in Section 1.03. of this Agreement.

*[The remainder of this page is intentionally left blank, with the signature pages immediately following on the next page.]*

IN WITNESS WHEREOF, the County of Onondaga and the City of Syracuse have caused this Agreement to be executed by their authorized representatives on the date indicated, to be effective upon the Effective Date as that term is described within this Agreement.

**ONONDAGA COUNTY**

Dated: _____, 2012

By: _____
MJM   Joanne M. Mahoney
Onondaga County Executive

**CITY OF SYRACUSE**

Dated: _____, 2012

By: _____
   Stephanie A. Miner
   Mayor

ATTEST:

_____
John P. Copanas, City Clerk

15

IN WITNESS WHEREOF the County of Onondaga and the City of Syracuse have caused this Agreement to be executed by their authorized representatives on the date indicated, to be effective upon the Effective Date as that term is described within this Agreement.

ONONDAGA COUNTY

Dated:_____

BY:_____
Joanne M. Mahoney
Onondaga County Executive

Dated: 3/26/2012

CITY OF SYRACUSE

By:_____
Stephanie A. Miner
Mayor

ATTEST:

_____
John P. Copanas, City Clerk

15

STATE OF NEW YORK   )
COUNTY OF ONONDAGA) ss.:

     On this   27 *th*   day of   __March__  , 2012, before me, the undersigned a Notary Public in and for said State, personally appeared **JOANNE M. MAHONEY,** to me known, who, being by me duly sworn, did depose and say that she resides in Syracuse, New York; that she is the County Executive of the County of Onondaga personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_Martin J. Murphy_
**Notary Public**

    MARTIN J. MURPHY
NOTARY PUBLIC, State of New York
Qual. Onon. Co., No. 02MU4906946
My Comm. Exp. Aug. 31, 20 *13*

STATE OF NEW YORK          )
COUNTY OF ONONDAGA  ) ss.:
CITY OF SYRACUSE           )

On this 26th day of March          , 2012 before me personally came Stephanie A. Miner, Mayor of the City of Syracuse, with whom I am personally acquainted, who, being by me duly sworn, did depose and say:  that she resides in the City of Syracuse, New York; that she is Mayor of the City of Syracuse, the corporation described in and which executed the within instrument; that she knows the corporate seal of said City of Syracuse and it was so affixed pursuant to the Charter of the City and that she signed said instrument as Mayor of said City of Syracuse by like authority; and the said Stephanie A. Miner further says that she is acquainted with John P. Copanas and knows him to be the City Clerk of said City of Syracuse and that the signature of John P. Copanas was hereto subscribed pursuant to said Charter and in the presence of her, the said Stephanie A. Miner, Mayor.

_Catherine E. Carnrike_
Notary Public

CATHERINE E. CARNRIKE
Notary Public, State of New York
No. 02CA6112791
Qualified in Onondaga County
Commission Expires July 12, 20__